The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Gregory M. Willis and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; or to amend the Opinion and Award.
* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act, with the defendant employing three or more regular employees.
2. At all times pertinent hereto, there was an employee-employer relationship between the plaintiff and defendant.
3. Defendant is self-insured under the provisions of the North Carolina Workers' Compensation Act.
4. The date of the alleged injury by accident is 14 July 1992.
5. Plaintiff average weekly wage was $114.98.
6. Plaintiff did not work for defendant from 20 July 1992 through 12 January 1993.
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. At the time of the initial hearing, plaintiff was fifty years-old, with a date of birth of 2 October 1943. For his education, plaintiff had completed high school and had completed two years of college and trade school, with courses in welding and auto mechanics. Plaintiff was employed by defendant as a welder, with job duties including fabricating metal, fitting pipes, and general maintenance welding.
2. Plaintiff alleges that he sustained an injury by accident on 14 July 1992. Prior to that time, plaintiff had received medical treatment from Dr. John Tuttle, his family doctor. In October 1990, Dr. Tuttle treated plaintiff for "malaise" and "heat stroke." In February 1992, about five months before his alleged accident, Dr. Tuttle placed plaintiff under permanent physical restrictions due to the arthritis in his knees and back. In March 1992 Dr. Tuttle prescribed that plaintiff could return to work with no restrictions, so long as he worked with knee pads and a back brace.
3. On 14 July 1992 plaintiff was working in scaffolding inside a large duct, six feet by four feet in diameter. The temperature inside the duct was the same as the temperature outside, and it was very hot. There was a fan which circulated air inside the duct. Plaintiff was wearing a tee-shirt, leather gloves and boots, and a had a cotton sockhood over his head and neck, and a hard hat. This was the same clothing plaintiff normally wore while performing his job.
4. On 14 July 1992 plaintiff began working at 7:00 a.m. Plaintiff was welding to splice duct work together. After about two hours, plaintiff took a thirty (30) minute break. Over the course of the morning, the temperature increased. At approximately 11:30 a.m. in the morning, plaintiff became weak; and he needed to go home. Plaintiff left work shortly afterward. On his way home, plaintiff bought an electrolyte fluid at a drug store.
5. The next day plaintiff returned to work at his regular job. He wore the same clothing as he usually wore. Although plaintiff felt hot, he was able to finish the day.
6. Two days later, on 16 July 1992, plaintiff was cleaning his work area and carrying steel. At approximately 3:30 p.m. plaintiff became very hot, and he reported this to his supervisor. Plaintiff was taken by his supervisor to the company nurse. After an examination the nurse sent plaintiff home and recommended that he see his family doctor.
7. Plaintiff was examined by Dr. Tuttle on 17 July 1992, a Friday. Plaintiff reported that he had "overheated" twice that week and that he had experienced "Malaise" for several weeks. Dr. Tuttle provided no treatment and prescribed no medications, but told plaintiff to stay out of heat in excess of eighty degrees.
8. On 20 July 1992, a Monday, plaintiff called his supervisor to report his restrictions. On 21 July 1992 plaintiff met with his supervisor, the company nurse, and a representative of the company's Human Resource Department. At this time there were no jobs available with the defendant which were within plaintiff's limitations, not working in temperatures over eighty degrees. Plaintiff did not work for defendant from 20 July 1992 through 12 January 1993.
9. Plaintiff did not contact defendant about a return to work. For the first three weeks that plaintiff was out of work, his supervisor called plaintiff to ask about his condition. In September 1992, Dr. Tuttle approved a job with defendant as a meter reader. In November 1992, defendant contacted plaintiff to offer him a job, but plaintiff was unable to accept the job due to physical restrictions unrelated to "overheating" or "malaise." In January 1993, defendant wrote a letter to plaintiff offering him a job, and plaintiff returned to work on 13 January 1993.
10. On 7 August 1992, about three weeks after he stopped working, plaintiff "overheated" while working in his yard; and he sought medical treatment from Dr. Tuttle. Beginning on 2 November 1992, plaintiff received treatment for phlebitis. From 2 November 1992 through 12 January 1993, any inability of plaintiff to be gainfully employed was caused by phlebitis; and there were jobs available with defendant which were within his restrictions and which he could have obtained, if not for the phlebitis.
11. The undersigned find limited weight in the testimony and opinions of Dr. Tuttle because of his mistaken belief that plaintiff was working in a "hot suit"; although plaintiff was actually working with a sockhood over his head.
12. "Overheating" is a temporary condition which kept plaintiff out of work on the afternoons of 14 July 1992 and 16 July 1992. The physical restrictions under which plaintiff should work were the same before and after 14 July 1992, the limitations were not increased. Plaintiff did not injure himself on 14 July 1992 as a result of an interruption of his regular work routine by unusual circumstance likely to result in unexpected consequences. In addition, plaintiff has failed to prove that he suffers from a disease which is peculiar to his employment and not an ordinary disease of life to which the general public is equally exposed.
* * * * * * * * * * *
Based upon the findings of fact, The Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. On 14 July 1992, plaintiff did not sustain an injury by accident arising out of and in the course of his employment with defendant. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff does not suffer from an occupational disease. N.C. Gen. Stat. § 97-53(13).
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Plainitff's claim for compensation pursuant to the North Carolina Worker's Compensation Act must be, and the same is hereby, DENIED.
2. Each side shall pay its own costs, except that defendant shall pay an expert witness fee in the amount of $200.00
 S/ __________________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ ______________________________ JAMES J. BOOKER COMMISSIONER